## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDRE FERGUSON<br><br>    Plaintiff,<br><br>    v.<br><br>WASHINGTON METROPOLITAN AREA<br>TRANSIT AUTHORITY<br><br>    Defendant. | Civil Action No. 20-3395 (CKK) |

### MEMORANDUM OPINION
(September 21, 2022)

Plaintiff Andre Ferguson ("Plaintiff") brings this employment discrimination action against Defendant Washington Metropolitan Area Transit Authority ("Defendant" or "WMATA"). Plaintiff's Amended Complaint raises three claims under Title VII of the Civil Rights Act of 1964: (1) racial discrimination; (2) hostile work environment based on race; and (3) retaliation based on engaging in protected activity.

Pending before the Court are the parties' cross motions for summary judgment. In its [19] Motion for Summary Judgment, WMATA contends that Plaintiff failed to exhaust his administrative remedies as to his hostile work environment and retaliation claims, as well as certain actions underlying his racial discrimination claim, by failing to include them in a Charge of Discrimination submitted to the U.S. Equal Employment Opportunity Commission ("EEOC"). WMATA also argues that, as to any remaining actions underlying Plaintiff's racial discrimination claim, he has failed to rebut WMATA's legitimate, non-discriminatory reasons for taking these actions. Plaintiff, in his [24] Opposition and Cross-Motion for Summary Judgment, contends that WMATA has not offered legitimate, non-discriminatory reasons for its actions, and that he is entitled to judgment as a matter of law in his favor as to each of the acts specified in his Amended Complaint.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court shall **GRANT** WMATA's Motion for Summary Judgment and **DENY** Plaintiff's Cross-Motion for Summary Judgment.

## I.    BACKGROUND

### A.  Factual Background

Plaintiff is an African American male, who was first employed by WMATA in 2012.  *See* Def.'s Stmt. ¶ 1; Pl.'s Stmt. ¶¶ 1, 2; Pl.'s Resp. Stmt. ¶ 1, 2.  Beginning in 2015, he served as Transit Asset Business Systems Manager.  Pl.'s Resp. Stmt. ¶ 2.

Plaintiff's claims against WMATA involve events occurring in 2017 through 2019.  The Court shall recount the facts underlying his claims chronologically.  In so doing, the Court "assume[s] that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).  As both parties have moved for summary judgment, the Court has considered each party's statement of material facts and the opposing party's response thereto,[2] as

---

[1] The Court's consideration has focused on the following: Defendant WMATA's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 19; Plaintiff's Opposition to Defendant WMATA's Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Pl.'s Opp'n & Cross-Mot."), *as corrected*, ECF No. 24; Defendant WMATA's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Def.'s Reply & Opp'n"), ECF No. 25; and Plaintiff's Reply in Support of Cross-Motion for Summary Judgment ("Pl.'s Reply"), ECF No. 27.  In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

[2] The Court shall refer to the parties' factual statements as follows: Defendant WMATA's Statement of Material Facts Not in Dispute ("Def.'s Stmt."), ECF No. 19-1; Plaintiff's Opposition to Defendant's Statement of Material Facts ("Pl.'s Resp. Stmt."), ECF No. 24-2; Plaintiff's Statement of Undisputed Facts ("Pl.'s Stmt."), ECF No. 24-3; and Defendant's Reply to Plaintiff's Counter-Statement of Undisputed Facts ("Def.'s Resp. Stmt."), ECF No. 25-2.

well as the cited portions of the record. The Court notes where facts are disputed, as well as where evidence relied upon by either party does not support the fact proffered.

### 1. WMATA's Decision Not to Interview or Hire Plaintiff for the Position of Director of Office of Transit Asset Management in 2017.

In 2017, Plaintiff was serving as the "Acting" Director of WMATA's Office of Transit Asset Management ("TAMO"). Pl.'s Stmt. ¶ 3. He applied to serve as the full-time Director for that position. *Id.* Plaintiff claims that he was required to submit his application twice, after being told that his initial application had not been received. *Id.* ¶ 6. The exhibit cited by Plaintiff appears to list all applicants for that position, and lists his name twice with different "last updated" dates (11/15/17 and 2/5/18). *See* Pl.'s Ex. 2, at 7 (Job Opening Printable Details).[3] The entry for the earlier "last updated" date is coded as an application from an "external applicant," whereas the latter is marked as an "employee." *Id.* Although this exhibit appears to confirm Plaintiff's statement that he submitted two different applications, it does not demonstrate his reason for doing so. *Id.*

Plaintiff was not interviewed or hired for the TAMO Director position. Def.'s Stmt. ¶¶ 2, 3; Pl.'s Stmt. ¶ 7. Instead, WMATA hired Gregory Collins, a white male, in February 2018. Def.'s Stmt. ¶ 3; Pl.'s Stmt. ¶ 8. Mr. Collins became Plaintiff's direct supervisor. Def.'s Stmt. ¶ 4.

During his deposition, Plaintiff recounted an encounter with Mr. Collins in 2016 (before Mr. Collins became his supervisor), in which Mr. Collins wrote "trash" on a drawing of an "asset management system" that Plaintiff had created. *See* Def.'s Ex. Deposition of Andre Ferguson ("Ferguson Dep.") 38:4–41:11, ECF No. 19-4.[4] Although Plaintiff claimed that he believed that

---

[3] Because Plaintiff has filed all of his exhibits in a single PDF document at ECF No. 24-4, the Court shall cite to the exhibit number and the page number in the bottom, righthand corner of each page.

[4] Defendant has not numbered its exhibits, but instead identifies them only by docket number.

this was a "discriminatory" interaction, there is no evidence that Mr. Collins' alleged action was racially motivated or involved race at all.  Moreover, during his deposition, Plaintiff testified that, during that time that he was Plaintiff's supervisor, Mr. Collins did not make *any* race-related comments or slurs to him.  *Id.* 62:22–63:12; 139:5–14.

### 2. Exclusion of Plaintiff from EALM/EASI Presentation to WMATA's Management in April 2019.

Plaintiff was one of the "program owners" of the "Enterprise Asset Lifecycle Management" ("EALM") program.  Pl.'s Stmt. ¶ 8.  Although Plaintiff's phrasing suggests that he was the sole owner of this program, the exhibit upon which he relies also identifies a "project sponsor" and another "project owner" (other than Plaintiff).  *See* Pl.'s Ex. 4, at 14 (Maximo Improvement Project, Executive Summary).  Moreover, nothing in this exhibit supports his claim that he was that program's "author"—however, WMATA does not appear to dispute this point, indicating only that his "authorship is immaterial."  *See id.*; Def.'s Resp. Stmt. ¶ 10.  The name of this program was changed to the "Enterprise Asset Management Initiative" ("EASI").  *See* Pl.'s Ex. 5, at 16 (2/22/2018 Emails between G. Collins and A. Ferguson).

It is undisputed that Mr. Collins—without Plaintiff—presented information about the EASI to WMATA's Executive Management Team in April 2019.  Def.'s Stmt. ¶ 5.  Plaintiff alleges that Mr. Collins "did not fully understand" the program and did a "poor job" presenting it.  Pl.'s Resp. Stmt. ¶ 5.  However, he cites only an email exchange from *2018* in which Mr. Collins requested Plaintiff's "feedback" on an attached document, and Plaintiff inquired about the name change to "EASI."  *Id.* (citing Pl.'s Ex. 5, at 16 (2/22/2018 Email from G. Collins to A. Ferguson)).

### 3. Plaintiff's 2019 End of Year Performance Evaluation.

In January 2019, Mr. Collins provided Plaintiff with a 2019 performance goals plan, which was signed by Plaintiff and Mr. Collins.  Pl.'s Stmt. ¶ 12.  Plaintiff claims that in April 2019, Mr.

Collins "sought to change the January 2019 performance goals," and used a "handwritten note to identify the change[ ], and the same electronic signature from the January 2019 document. *Id.* ¶ 13. Plaintiff cites to the first page of his Exhibit 6, without furnishing a precise citation to the particular page which he appears to contend was changed. The only handwriting that the Court identifies is written: "January – March" above the typed title of the document ("Performance Management Evaluation, January – June 2019"). *See* Pl.'s Ex. 6, at 18 (Performance Management Evaluation). Plaintiff points to no other change to this document. *See* Pl.'s Opp'n & Cross-Mot. at 7 (observing that "January – March" was handwritten on the document). Therefore, it is unclear to the Court what (if any) substantive "change" Plaintiff refers to, and what effect, if any, he is claiming any "change" had on his employment status.

On August 1, 2019, Mr. Collins presented to Plaintiff his 2019 end-of-year ("2019 EOY") performance evaluation. Def.'s Stmt. ¶ 6. Plaintiff received a score of "7" based on his performance of the objectives agreed to at the beginning of the review period. *Id.*; *see* Def.'s Ex. (Performance Management Evaluation), ECF No. 19-7. This rating correlated to a "needs improvement" designation, which mandated that the employee be assigned to a Performance Improvement Plan ("PIP"). Def.'s Stmt. ¶ 7. Plaintiff contends that the 2019 EOY performance evaluation "was not credibly created," citing a letter he appears to have drafted, explaining that he received three EOY performance evaluations from Mr. Collins within a few days. *See* Pl.'s Ex. 9, at 36–37 (8/2/19 Email to T. Webster). In this letter, Plaintiff states that on July 29, Mr. Collins gave him "two performance evaluations," with "my digital signature, time, and date of review with objectives and commentary that I had never seen before." *Id.* He noted that one evaluation stated that he was a "solid performer," whereas the second included the "improvement need" designation. *See id.* Plaintiff suggests that his performance objectives had been modified without his

knowledge.  *Id.* at 37; *see also* Pl.'s Resp. Stmt. ¶ 6.  However, neither of these documents contains *any* signature in the "Rating" section of the document.  Pl.'s Ex. 6, at 26, 28.

WMATA has provided a memo from Mr. Collins, dated August 2, 2019.  *See* Def.'s Reply Ex. (Memo RE: Performance Management Plan for Andre Ferguson (Aug. 2, 2019)), ECF No. 25-1. The memo explains that an "initial [Performance Management Plan ("PMP")] was developed in January" with respect to Plaintiff to "capture[] objectives which were to be attained" for January through June 2019.  *Id.*  It further states that in March 2019, a "business decision was made to realign the roles and responsibilities of the office."  *Id.*  Mr. Collins indicates that he consulted with an HR representative regarding Plaintiff's EOY performance evaluation because Plaintiff's "duties had been modified in March."  *Id.*  According to the memo, HR told Mr. Collins that the "creation of a revised Plan second page with duties and performance during the latter part of the period could be included in the Plan."  *Id.*  Mr. Collins indicates that this document was "created and shared with [Plaintiff] for discussion" and to "demonstrate the direction provided by HR," but noted that "the new document would not modify the original Plan."  *Id.*

WMATA has submitted a copy of the final August 2, 2019 performance rating, which indicates that Plaintiff received a score of "7."  *See* Def.'s Ex. (Performance Management Evaluation), ECF No. 19-7.  Other evidence on the record confirms that the "other" evaluations Plaintiff received from Mr. Collins were not signed by any supervisor or by Plaintiff and were *not* made part of Plaintiff's employment record as they were not final.  *See* Pl.'s Ex. 6, at 26, 28 (unsigned 2019 EOY "ratings"); Def.'s Reply Ex. (Memo RE: Performance Management Plan for Andre Ferguson (Aug. 2, 2019)), ECF No. 25-1.

On August 16, 2019, Collins was terminated for violating WMATA's Workplace Violence Policy.  Def.'s Stmt. ¶ 8.  Two days earlier, on August 14, 2019, Plaintiffs submitted a "Witness

Statement," explaining that he had overhead a conversation between Collins and an African American female employee, in which Mr. Collins was "yelling and screaming profanity." *See* Pl.'s Ex. 8, at 34 (Ferguson Witness Stmt.). There is no evidence that Mr. Collins made any racial comments during this incident.

### 4. Plaintiff's EAP Leave and Delayed Receipt of Pay in October 2019.

At some point in August 2019, Plaintiff "sought out help" from WMATA's Employee Assistance Program ("EAP"). Pl.'s Stmt. ¶ 17.[5] From August 2019 until October 2019, Plaintiff took a Paid Leave of Absence after participating in EAP sessions. Def.'s Stmt. ¶ 9. Plaintiff indicates that he went on leave due to "workplace hostility" and after being advised by EAP to do so. Pl.'s Resp. Stmt. ¶ 9. However, he cites only an EAP intake form that provides no explanation for his reason for seeking assistance or going on leave.[6]

As of October 1, 2019 (while Plaintiff was still on leave), WMATA realigned some of its departments. Francesco Palmeri became the Acting Vice President of Reliability and Asset Management ("REAM") and was charged with overseeing the "realignment of TAMO into REAM." Def.'s Stmt. ¶ 10. Due to this realignment, Mr. Palmeri was also tasked with hiring a new TAMO Director, the position left vacant by Mr. Collins' termination. *Id.* ¶ 11.

Plaintiff claims that when he returned to work from EAP leave in October 2019, his "pay code" was incorrect, which "prevented" him from being paid on time. Pl.'s Stmt. ¶¶ 22, 23. Plaintiff alleges that his second-level supervisor, Shyam Kannan, intentionally changed the pay

---

[5] Plaintiff characterizes this action as a "protected activity," which is not a fact, but a legal conclusion. Pl.'s Stmt. ¶ 17. WMATA does not object to the fact thar Plaintiff sought help through EAP, but objects only to Plaintiff's characterization of this as a protected activity. Def.'s Resp. Stmt. ¶ 17; *see also infra* Section III(C).

[6] The Court observes that this document contains some handwritten responses, with others that appear to have been overwritten by random text (*e.g.*, in the space for "Counselor Assigned to the Case," the entry contains in typewritten text: "Dv-,*ll?on\(e…*1\1.").

code to reflect that he was on a "leave of absence" rather than paid EAP leave.  *Id.* ¶ 23.  In support

of this claim, Plaintiff cites an email he wrote to HR dated October 24, 2019, in which he explained

that he "was not paid" on October 9.  He indicated that he asked TAMO's Acting Director, Quang

Nguyen, why he had not been paid; Mr. Nguyen responded that Mr. Kannan was handling HR and

payroll issues tasks since Mr. Collins had been terminated and that Mr. Nguyen did not know why

Plaintiff had not been paid.  *See* Pl.'s Ex. 10, at 40 (10/24/19 Email from A. Ferguson to B.

Creavalle);  Pl.'s Ex. 13, at 61 (10/10/19 Email from Q. Nguyen to A. Ferguson).  Plaintiff then

stated that he had called "payroll," and was informed that a "manager" had "coded [him] with a

Leave of Absence code" so that he "could not get paid."  Pl.'s Ex. 10, at 41 (10/24/19 Email from

A. Ferguson to B. Creavalle); *see also* Pl.'s Am. Compl. Ex. 14 (email from "payroll specialist"

indicating that "HR will need to change your status to *Leave With Pay . . .* As of now you are in

the system as just Leave of Absence").  Plaintiff then claims that he spoke with Mr. Nguyen on

October 10, because Plaintiff had heard that Mr. Nguyen had tried to contact EAP to obtain

"personal information."  *Id.*  Mr. Nguyen reportedly told Plaintiff that he had contacted EAP to

determine "why [Plaintiff] did not come to work," and when he did not receive information, Mr.

Nguyen was "forced not to pay" Plaintiff.  *Id.*; *see also* Pl.'s Ex. 13, at 61 (10/11/19 Email from

A. Ferguson to Q. Nguyen").

Plaintiff testified during his deposition that this incident was resolved when he received his

paycheck within one or two weeks.  *See* Ferguson Dep. 187:15–188:10; *see also* Pl.'s Reply at 8

(characterizing this incident as "withholding Plaintiff's pay for a week").

### 5.   **WMATA's Decision Not to Interview or Hire Plaintiff for TAMO Director Position in 2019.**

In November 2019, Plaintiff again applied for the TAMO Director position.  Pl.'s Stmt.

¶ 25.  Plaintiff was not selected to interview for the position.  Def.'s Stmt. ¶ 12; Pl.'s Stmt. ¶ 28.

An individual named Doojin Han was ultimately hired for the position, as of December 9, 2019. Def.'s Stmt. ¶ 13; Pl.'s Stmt. ¶ 26. Plaintiff was notified that he was not selected on December 11, 2019.  Pl.'s Stmt. ¶ 27.

The parties dispute the reasons Plaintiff was not interviewed or hired for the TAMO Director position in 2019.  WMATA has offered the declaration of Mr. Palmeri, who was serving as Plaintiff's second-line supervisor at the time.  *See* Def.'s Ex. Declaration of Francesco Palmeri ("Palmeri Decl.") ¶¶ 3–4, ECF No. 19-2; *see also supra* Section I(A)(4) (noting that in his role as Vice President of REAM, Mr. Palmeri oversaw the realignment of TAMO into REAM).  Mr. Palmeri attests that "[d]uring realignment, I became aware that one of the employees being realigned was to be put on a [PIP] due to his 2019 [EOY] performance evaluation, but that the PIP process was still in the process of finalization."  *Id.* ¶ 6.  Initially, Mr. Palmeri did not know which employee this was.  Mr. Palmeri attests that he inquired if Plaintiff was the employee who was "to be placed on a PIP" after he observed "several unacceptable behaviors from [Plaintiff], including speaking over colleagues in a meeting, employees expressing a refusal to work with him because of this erratic behavior, and a lack of competency expected of a person at his level."  *Id.* ¶¶ 7, 8. He explains that he had planned to interview Plaintiff for the TAMO Director position, until he learned that Mr. Collins had recommended that Plaintiff be placed on a PIP based on his 2019 EOY performance evaluation.  *Id.* ¶ 9.  Mr. Palmeri states that WMATA's "Employee Relations" confirmed that a "PIP was to be enforced" against Plaintiff, which made him ineligible for "promotion."  *Id.* ¶ 10.  Mr. Palmeri avers that based on this confirmation, as well as his own observations of Plaintiff's job performance, Plaintiff was removed from the list of candidates to be interviewed for the TAMO Director position.  *Id.* ¶ 11.  Finally, Mr. Palmeri notes that after he learned that Plaintiff should have been placed on a PIP after his 2019 EOY evaluation, the "official

PIP" was finalized as of December 16, 2019; signed by Mr. Kannan on December 24, 2019; and presented to Plaintiff on December 27, 2019.  *Id.* ¶ 12.

Plaintiff contests WMATA's explanation.  Notably, however, he does not offer any evidence or otherwise dispute Mr. Palmeri's observations of Plaintiff's "unacceptable behavior."

Instead, Plaintiff contends that there was "no existing" PIP at the time he applied for the position.  He claims that he met with Mr. Palmeri on December 20, 2019, and was told that he was not going to be selected for the position because he was on a PIP.  Pl.'s Stmt. ¶ 31.  In support of this, Plaintiff cites only an untitled and unaddressed document that he appears to have drafted, dated May 24, 2020, which indicates that Mr. Palmeri told him on December 20, 2019 that he was not interviewed for the Director job because he was "on a PIP" and "not allowed to interview for jobs." Pl.'s Ex. 46, at 233 (Untitled Summary dated 5/4/2020).[7]  Plaintiff claims that the PIP was not "created" until *after* the Director position had been filled and *after* his conversation with Mr. Palmeri—and so Mr. Palmeri's justification for not interviewing him because he was on a PIP was false.  *See* Pl.'s Resp. Stmt. ¶ 12; *see also* Ferguson Dep. 214:11–216:20.

Based on the record before the Court, it is undisputed that Plaintiff was not immediately placed on a PIP when he received his 2019 EOY performance evaluation in August.  However, Plaintiff's former second-level supervisor wrote in an email dated September 27, 2019 that Plaintiff had been recommended for a PIP based on his 2019 EOY evaluation, but that "[Mr. Collins] never put together the actual PIP with Employee Relations and Mr. Ferguson."  Pl.'s Ex. 13, at 60 (9/27/19 Email from S. Kannan).  The same email indicates that there remained an "issue" relating to whether Plaintiff's EAP leave would be characterized as "intermittent" or "continuous,"

---

[7] Plaintiff also cites the August 2019 memo by Mr. Collins, which says nothing about his conversation with Palmeri in December 2019.  He appears to rely on this memo to demonstrate that there was no PIP in place in August, after he received his EOY review.  *See* Pl.'s Stmt. ¶ 30.

which affected the timing of his PIP placement.  *Id.*  In sum, Plaintiff's supervisors knew that he was supposed to be on a PIP but that its implementation had been delayed due to Mr. Collins' termination and Plaintiff's EAP leave.

Based on the record, no PIP had been finalized or presented to Plaintiff when he applied for the TAMO Director position in November 2019.  Mr. Palmeri attests that the "official" PIP was "finalized" on December 16, 2019.  Palmeri Decl. ¶ 12; *see also* Def.'s Ex. PIP dated 12/16/2019, ECF No. 19-8.  But emails provided to the Court indicate that a "draft" version was still being circulated between December 17 and 20, 2019, and a finalized PIP was circulated for supervisors' signatures until December 24, 2019.  *See* Pl.'s Ex. 16, at 71 (12/17/2019 Email from, F. Palmeri); *see also* Palmeri Decl. ¶ 12 (noting that Mr. Kannan signed the PIP on December 24, 2019).

Mr. Han (the newly hired TAMO Director) presented the PIP to Plaintiff on December 27, 2019.  Pl.'s Stmt. ¶ 32; Pl.'s Ex. 16, at 86 (12/27/2019 Email from D. Han).  Mr. Han reported that when he discussed the PIP with Plaintiff, Plaintiff refused to sign it because he "contest[ed]" the performance evaluation upon which the PIP was based.  Pl.'s Ex. 16, at 86 (12/27/2019 Email from D. Han).  Mr. Han recounted in an email that Plaintiff "showed [him] 2 different evaluations . . . the Jan – March evaluation had 'needs improvement' and the April – June evaluation had 'solid performer.'  Neither evaluation[ ] was signed by anyone." *Id.*

Plaintiff successfully completed his PIP as of February 28, 2020.  *See* Pl.'s Stmt. ¶ 35; Pl.'s Ex. 41, at 219 (5/29/2020 WMATA Memo Re: Employee Relations Complaint).  During the period while he was on a PIP, on February 20, 2020, he was offered a position as a Project Manager, Vehicles for WMATA.  *See* Pl.'s Ex. 18, at 95 (Offer Letter to A. Ferguson).  Plaintiff accepted that position and left TAMO.  Def.'s Stmt. ¶ 16.  He contends that the fact that he was *hired* for a

different position while he was still on a PIP undermines Mr. Palmeri's explanation that he could not be *promoted* to TAMO Director because he was supposed to be on a PIP.  Pl.'s Resp. Stmt. ¶ 16.  However, Plaintiff himself testified that his new position was not a "promotion."  *See* Ferguson Dep. 225:1–226:3 (testifying that the new position he accepted was a "lower role" for which he received "the same pay").  And even if it was, there is no evidence on the record indicating that Plaintiff was excluded from considering or interviewing for *any* job at WMATA due to his PIP; Plaintiff testified only that Mr. Palmeri had purportedly told him that he had not been interviewed for this *particular position* due to his PIP, not that he was barred from pursuing any other open position at WMATA.  *See* Ferguson Dep. 215:3–6; 221:6–20.

### 6. Plaintiff's Complaints to WMATA and EEOC.

Plaintiff submitted a complaint to WMATA's Office of Equal Employment Opportunity ("OEEO") on December 27, 2019, alleging that Palmeri had discriminated against him based on his "race" and "sex" by declining to interview him for the TAMO Director position.  Def.'s Stmt. ¶ 15; Def.'s Ex. WMATA OEEO Report of Investigation, ECF No. 19-9.  WMATA's OOEO concluded that Plaintiff had "not suffer[ed] an adverse employment action" and that "the decision not to interview him for the Director's position was [not] based on race and gender"; rather, "[i]t appears that management's decision not to consider [Plaintiff] for the position was based on [Plaintiff's] poor performance."  WMATA OEEO Report of Investigation at 8.

Plaintiff wrote a letter to the EEOC, dated April 30, 2020 ("EEOC Letter"), indicating that he was "writing to file an EEOC charge of discrimination."[8]  *See* Def.'s Ex. (EEOC Letter), ECF No. 19-5; *see also* Ferguson Dep. 58:8–13 (indicating that he "submitted" this letter on April 30,

---

[8] WMATA misstates the date of this submission in its Statement of Facts as March 30, 2020.  *See* Def.'s Stmt. ¶ 17.  The date stated on the document is April 30, 2020 (next to Plaintiff's signature). *See* ECF No. 19-5.

2020).  The letter is stamped as "received" by the EEOC's Washington Field Office on May 5,

2020.  *Id.*  Under a heading entitled "a short description of the actions you believe were

discriminatory," Plaintiff wrote:

> I have been subject to discrimination based on my race and gender
> because I was not provided an opportunity to be considered for
> promotion to the vacant Director of Asset Management.  On Dec.
> 20th 2019, I was harassed by Frank Palmeri (VP) and he indicated
> that I had not been selected to interview because I had been placed
> on a Performance Improvement Plan (PIP).  I explained to [F]rank
> that I had never been put on a PIP.  I also explained to him that I had
> been selected for interviews recently, so it is obvious that I was not
> on a PIP.  He stated that they are going to make one up on me and I
> would have it soon.

*Id.*  In addition, Plaintiff indicated that the discriminatory actions "took place" only on "Dec. 29th."

*Id.*  Plaintiff noted that he believed he was discriminated against "[b]ecause they do not want a

Black Male to represent that department."  *Id.*

Plaintiff filed a formal Charge of Discrimination with the EEOC ("EEOC Charge") on June

23, 2020.  *See* Def.'s Mot. Ex. EEOC Charge, ECF No. 19-6.  Plaintiff selected "Race," "Color,"

and "Sex" as the basis for Discrimination and provided July 1, 2019 through December 20, 2019

as the "date(s) discrimination took place."  *Id.*  He did *not* select "Retaliation" as a basis for

discrimination.  *Id.*  In the space provided for a description of his claim, Plaintiff indicated:

> On November 15, 2019, I applied for position of Director of Asset
> Management
>
> On December 20, 2019, I met with Frank Palmeri (VP) and he
> indicated that I had not been selected to interview because I had been
> placed on a Performance Improvement Plan (PIP).  I explained to
> Frank that I had never been put on a PIP.  I also explained to him
> that I had been selected for interviews recently, so it is obvious that
> I was not on a PIP.  He stated that I was on PIP and that he would
> get one created on me and I would have it soon. Frank Palmeri had
> Shyam Kannan, someone who I no longer work for, create a
> fraudulent PIP on Dec. 24th, 2019, to justify Palmeri not
> interviewing me for the position because I am a black male.

> I believe I have been discriminated against due to my race (black), color and sex (male), in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Id.* at 1.

On August 27, 2020, the EEOC dismissed Plaintiff's Charge, concluding that it was "unable to conclude that the information obtained establishes a violation" of Title VII. *See* Pl.'s Am. Compl. Ex. 2 (EEOC Dismissal), ECF No. 8-1.

### B.  Procedural Background

Plaintiff filed his Original Complaint in this action on November 23, 2020.  Compl., ECF No. 1.  His Original Complaint included claims for race discrimination, retaliation, and hostile work environment under Title VII, as well as hostile work environment and race discrimination claims under the D.C. Humans Right Act ("DCHRA").  *See id.*  WMATA filed a [7] Partial Motion to Dismiss Plaintiff's DCHRA claims on the basis that WMATA, "as an interstate compact agency, is not subject to claims under the DCHRA."  *See* WMATA's Mot. to Dismiss at 1, ECF No. 7.  Plaintiff then filed an Amended Complaint on December 17, 2020, which eliminated the DCHRA claims.  *See* Am. Compl. ECF No. 8.  As a result, the Court denied without prejudice WMATA Partial Motion to Dismiss.  *See* Minute Order (Dec. 17, 2020).  WMATA answered Plaintiff's Amended Complaint on January 7, 2021.  *See* Answer, ECF No. 10.  After proceeding with discovery, which concluded as of September 23, 2021, the parties filed their pending cross motions for summary judgment, both of which are ripe for the Court's review.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary

judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009); *see also Sibert-Dean v. WMATA*, 751 F. Supp. 2d 87, 90 (D.D.C. 2010) (requiring the non-moving party's factual representations in a sworn affidavit to be supported by facts in the record). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in his favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v.*

15

*Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  The district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

In recognition of the difficulty in uncovering clear evidence of discriminatory or retaliatory intent, the district court should approach summary judgment in an action for employment discrimination or retaliation with "special caution."  *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).  But the Court's "special caution" does not relieve the plaintiff of his burden to support his allegations with competent evidence.  *See Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009).  As in any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, at the summary judgment stage he bears the burden of production to designate specific facts showing that there exists a genuine dispute requiring trial.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary judgment device—namely, "to weed out those cases insufficiently meritorious to warrant . . . trial"—simply by way of offering conclusory allegations, speculation, and argument.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### III.    DISCUSSION

#### A.  Race Discrimination Claim (Count I)

Under Title VII of the Civil Rights Act, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1).  Title VII "requires that an employee exhaust [his] administrative remedies by filing a claim with the EEOC prior to filing suit in the district court." *Headen v. WMATA*, 741 F. Supp. 2d 289, 294 (D.D.C. 2010) (citing 42 U.S.C. § 2000e–5(e)(1), (f)(1)); *see also Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) ("Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge.").

Plaintiff contends that the following actions constitute adverse actions taken by WMATA on the basis of his race: the denial of an interview for the TAMO Director position twice (first in 2017 and again in 2019); the denial of the opportunity for him to present the EALM/EASI in April 2019; having his pay delayed after returning from EAP leave in October 2019, and being placed on a PIP in December 2019.  *See* Am. Compl. ¶ 92.  The Court must first determine which claims Plaintiff has properly exhausted.  *See Dudley v. WMATA*, 924 F. Supp. 2d 141, 155 (D.D.C. 2013).

### 1.   Exhaustion of Administrative Remedies

A plaintiff seeking to pursue a Title VII claim in federal court must have first exhausted his administrative remedies by filing a claim with the EEOC.  *Park*, 71 F.3d at 907.  An EEOC charge must "be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."  § 2000e–5(e)(1).[9]  A plaintiff must "exhaust [his] administrative remedies

---

[9] Ordinarily, if a claimant has "initially instituted proceedings with a State or local agency with authority to grant or seek relief from" a discriminatory act, the 180-day timeframe is extended to 300 days.  *Whorton v. WMATA*, 924 F. Supp. 2d 334, 345 n.8 (D.D.C. 2013) (internal citations omitted).  "But, because WMATA is part of an interstate compact agency, the compact jurisdictions have conferred their sovereign immunity upon it."  *Id.* (citing *Jones v. WMATA*, 205 F.3d 428, 432 (D.C. Cir. 2000)).  Therefore, "WMATA is not subject to the state or local antidiscrimination laws," and so the local authority was "without authority to grant or seek relief for the plaintiff.  Consequently, the 300[-]day provision is inapplicable and the 180[-]day provision controls."  *Id.*

within the Title VII limitations period for *each discrete act of discrimination* alleged or lose the ability to recover for it." *Lipscomb v. Winter*, 577 F. Supp. 2d 258, 271 (D.D.C. 2008) (emphasis added); *see also Wada v. Tomlinson*, 517 F. Supp. 2d 148, 183 (D.D.C. 2007) ("[A] Title VII plaintiff is required to exhaust his or her administrative remedies with respect to each discrete allegedly discriminatory or retaliatory act[.]").  The Supreme Court has directed that "[d]iscrete discriminatory acts are *not* actionable if time barred, even when they are related to an act alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (emphasis added).  Accordingly, "[t]he theories of discrimination in [a] plaintiff's lawsuit are limited to the theories contained in the EEOC Charge he filed." *Marcelus v. Corrs. Corp. of Am./Corr. Treatment Facility*, 540 F. Supp. 2d 231, 236 (D.D.C. 2008).

WMATA argues that Plaintiff has failed to exhaust his administrative remedies as to the following alleged discriminatory acts by failing to raise them in an EEOC Charge:  (1) the failure to be promoted to Director of TAMO in 2017; (2) the denial of the opportunity to present EASI to the WMATA executive management team in April 2019; and (3) the late receipt of pay in October 2019.  The incidents involving the failure to be promoted in 2017 and his exclusion from the EASI presentation in April 2019 are plainly time-barred, because they occurred well beyond the 180-day period preceding his April 30, 2020 EEOC Letter and June 23, 2020 EEOC Charge.[10]  Based on the record before the Court, the incident regarding Plaintiff's delayed receipt of pay in October 2019 also falls outside the 180-day window preceding his initial contact with the EEOC on April 30, 2020.[11]

---

[10] Plaintiff's only response to this argument is that these claims are not time-barred because he "waited 180 days to file suit." Pl.'s Reply at 6.  This argument misses the point.  He was required to file a charge with the EEOC within 180 days of an "unlawful employment practice."

[11] The Court has calculated that 180 days before April 30, 2020 was November 2, 2019.

More importantly, neither Plaintiff's EEOC Letter nor his formal EEOC Charge references *any* of these alleged discriminatory acts.  WMATA contends that his failure to raise these events in his EEOC submissions bars him from pursuing them in federal court.  *See* Def.'s Mot. at 7.  The Court agrees, based on the Supreme Court's clear directive in *Morgan* that "discrete discriminatory acts are *not* actionable if time barred, even when they are related to an act alleged in timely filed charges."  *Morgan*, 536 U.S. at 114 (emphasis added).  Though not succinctly articulated, Plaintiff appears to ask the Court to adopt a "more forgiving standard," citing *Dudley v. WMATA* for the proposition that some courts "have read *Morgan* narrowly" and found that "incidents of discrimination . .  'like or reasonably related to those claims in the administrative complaint' do not need to be separately charged."  924 F. Supp. 2d at156 .  But, even under this "more forgiving standard," Plaintiff has not offered any argument or pointed to any evidence connecting the denial of a promotion in 2017, the denial of the opportunity to present EASI in April 2019, or his late receipt of pay in October 2019 to the incidents described in his EEOC submissions.  Both his EEOC Letter and his formal EEOC Charge recount only WMATA's decision not to interview him for the vacant TAMO Director position in November/December 2019 and his allegation that his supervisors created a "fraudulent" PIP during that same time period.  *See supra* Section I(A)(6).  Plaintiff argues that the failure to interview him for the TAMO Director in 2017 "correlates" to the failure to interview him for the same position in 2019 because both incidents "involve the same position and person."  Pl.'s Reply at 6.  But this conclusory assertion is insufficient to establish any connection between these events—ignoring, for example, that these incidents occurred years apart, and involved different decisionmakers who provided different reasons for declining to interview Plaintiff based on entirely different factual circumstances.  He offers no other reason for

the Court to view these discrete events as "reasonably related" to those raised in his submissions to the EEOC, and so the Court shall not consider them.

Plaintiff correctly notes that the failure to exhaust administrative remedies under Title VII is not a "jurisdictional bar."  Pl.'s Opp'n & Cross-Mot. at 11; *see Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1851 (2019) ("Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts."); *Menominee Indian Tribe of Wisconsin v. United States*, 614 F.3d 519, 527 (D.C. Cir. 2010) (explaining that Title VII does not "incorporate[ ] a jurisdictional exhaustion requirement"). However, "[t]he plaintiff has the burden of pleading and proving any equitable reasons for his or her failure to comply with Title VII's time requirements." *Bass v. Bair*, 514 F. Supp. 2d 96, 99 (D.D.C. 2007) (citing *Saltz v. Lehman*, 672 F.2d 207, 209 (D.C. Cir. 1982)).  And "[t]he court's power to equitably excuse noncompliance with administrative filing deadlines" will be "'exercised only in extraordinary and carefully circumscribed instances.'"  *Smith-Thompson v. Dist. of Columbia*, 657 F. Supp. 2d 123, 132 (D.D.C. 2009) (quoting *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988)).

Plaintiff has not offered any persuasive reason to excuse his failure to exhaust his administrative remedies as to incidents not included in his EEOC Letter or EEOC Charge.  He asserts (without any supporting argument) that "equitability" weighs in his favor because WMATA "was aware" of all of these incidents. Pl.'s Opp'n & Cross-Mot. at 11–12.  But "if filing internal grievances [was] sufficient, alone, to put WMATA on notice that [Plaintiff] intended to pursue Title VII actions, then requiring an EEOC Charge would be superfluous" because "Plaintiff could simply avoid the administrative process entirely by filing an internal grievance, and

proceeding directly to federal court[.]" *Dudley*, 924 F. Supp. 2d at 158. Plaintiff has failed to offer any persuasive reason compelling the Court to waive Title VII's exhaustion requirement.

Plaintiff's EEOC Letter and EEOC Charge discuss only WMATA's decision not to interview him for the TAMO director position in 2019 and his placement on a PIP thereafter. Because Plaintiff failed to exhaust his administrative remedies as to the other alleged discriminatory acts—and has not articulated a reason compelling the Court to excuse this failure— Plaintiff is barred from proceeding with his race discrimination claim insofar as it relies on the denial of a promotion in 2017, the denial of the opportunity to present EASI in April 2019, and his late receipt of pay when he returned from leave in October 2019.

### 2. Merits of Plaintiff's Remaining Race Discrimination Claims

The Court next proceeds to the merits of Plaintiff's remaining race discrimination claims, which rely on not being interviewed or hired for the TAMO Director position in December 2019 and being placed on a PIP shortly thereafter.

To prove a claim of racial discrimination under Title VII, a plaintiff must demonstrate that the actions taken by an employer were "more likely than not based on the consideration of impermissible factors," including race. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal citation omitted). Absent direct evidence of discrimination,[12] the plaintiff may indirectly prove discrimination pursuant to the tripartite burden-shifting articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a prima facie case of discrimination; if [he] does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and if it does, then

---

[12] "Direct evidence of discrimination is evidence that, if believed by the factfinder, proves the particular fact in questions *without any need for inference*." *Brown v. Small*, 437 F. Supp. 2d 125, 130 n.7 (D.D.C. 2006) (emphasis in original) (citing *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989)).

the plaintiff must receive an opportunity to show that the employer's reason was a pretextual cover for discrimination." *Wang v. WMATA*, 206 F. Supp. 3d 46, 64 (D.D.C. 2016) (citing *McDonnell Douglas*, 411 U.S. at 802–05).

On summary judgment, however, if the employer puts forth a "legitimate, non-discriminatory reason" for its actions, the "question whether the employee actually made out a prima facie case is no longer relevant." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (citations and quotation marks omitted). "[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.* at 494 (emphasis in original). Rather, "the district court must resolve one central question: *Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee[?]*" *Id.* (emphasis added) (citations omitted). If a plaintiff fails to produce evidence sufficient for a reasonable jury to find that the employer's legitimate, non-discriminatory reason was not the actual reason for the employer's action, then summary judgment in favor of the employer is proper. *See id.* at 496–97.

According to WMATA, Plaintiff was not interviewed for the TAMO Director position because of "Palmeri's observations of Plaintiff's poor job performance and leadership skills, as well as the fact that Plaintiff was *supposed to be* placed on a PIP following his 2019 EOY evaluation." Def.'s Mot. at 8 (emphasis added). The reason for placing Plaintiff on a PIP was based on the unsatisfactory score he received on his 2019 EOY performance evaluation in August 2019. The Court finds that WMATA has offered legitimate, non-discriminatory reasons for its

decision not to interview or hire Plaintiff for the TAMO position in 2019 and his placement on a PIP.  Therefore, the burden shifts to Plaintiff to prove that "the proffered reason is a pretext for discrimination."  *McDonnell Douglas*, 411 U.S. at 804.

A plaintiff can demonstrate pretext by "providing evidence from which a reasonable jury could find that the employer's proffered, lawful reasons for acting are 'unworthy of credence.'" *Jackson v. Dist. Hosp. Partner, L.P.*, Civil Action No. 18-1978 (ABJ), 2022 WL 3910501, at \*4 (D.D.C. Aug. 31, 2022) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000)).  It is not sufficient for a plaintiff to "show that a reason given for a job action [was] not just, or fair, or sensible," nor is it sufficient to challenge "the correctness or desirability of [the] reasons offered."  *Id.* (quoting *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)) (internal quotation marks omitted).  "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts."  *Brady*, 520 F.3d at 495.

Plaintiff has not offered any evidence to rebut Mr. Palmeri's sworn testimony that his decision not to interview Plaintiff for the TAMO Director position resulted from "several unacceptable behaviors from [Plaintiff], including speaking over colleagues in a meeting, employees expressing a refusal to work with him because of this erratic behavior, and a lack of competency expected of a person at his level."  Palmeri Decl. ¶¶ 7, 8.  Instead, Plaintiff attacks Mr. Palmeri's declaration as "lacking credibility."  Pl.'s Opp'n & Cross-Mot. at 9, 14.  But merely attempting to discredit Mr. Palmeri's testimony as "unworthy of credence," without offering any supporting evidence is insufficient to create a triable issue.  *See Dudley*, 924 F. Supp. 2d at 160. Based on Plaintiff's failure to present any evidence to contravene Mr. Palmeri's observations, he has not demonstrated that there is a genuine issue for trial that this reason for declining to interview

Plaintiff for the TAMO Director position was pretext for racial discrimination.  *See Jackson*, 2022 WL 3910501, at *5.

Plaintiff further claims that Mr. Palmeri told him on December 20, 2019 that he was not selected to interview for the TAMO Director job "because he was on a PIP," even though Plaintiff did not receive the PIP until several days later.  Pl.'s Opp'n & Cross-Mot. at 9.  Plaintiff claims that this explanation was false, both because he did not receive the PIP until later and because he later obtained another position in a different WMATA department while he was still on a PIP.  *Id.* at 10; Pl.'s Reply at 7–8.  Mr. Palmeri's declaration indicates that he decided not to interview Plaintiff when he learned that Plaintiff had been "recommended" for a PIP based on his 2019 EOY evaluation, which rendered him "ineligible for promotion."  Palmeri Decl. ¶ 10.  However, even crediting *Plaintiff's* version of events (that Mr. Palmeri told him that he could not be promoted because he was "on a PIP"), the Court concludes that Plaintiff has not produced sufficient evidence to allow a reasonable juror to conclude that this reason was pretext for unlawful discrimination. Rather, the evidence on the record indicates that the PIP was already being finalized by the time Plaintiff purportedly spoke with  Mr. Palmeri.  Because Plaintiff has not come forward with any evidence that would enable a reasonable juror to conclude that WMATA's stated reasons for its actions against plaintiff were a pretext for unlawful discrimination on the basis of race, summary judgment in WMATA's favor on this claim is appropriate.

\*\*\*

Plaintiff has failed to exhaust his administrative remedies insofar as his race discrimination claim relies on the denial of a promotion in 2017, the denial of the opportunity to present EASI in April 2019, and his late receipt of pay when he returned from leave in October 2019.  As to the remaining claims involving the denial of an interview for the TAMO Director position in 2019 and

PIP, Plaintiff has failed to offer evidence to rebut WMATA's legitimate, non-discriminatory reasons for these actions. Accordingly, the Court **GRANTS** WMATA's Motion for Summary Judgment as to Count I of the Amended Complaint (race discrimination) and **DENIES** Plaintiff's Cross-Motion for Summary Judgment as to the same.

### B.  Hostile Work Environment Claim (Count II)

WMATA next argues that because Plaintiff failed to allege a hostile work environment in his EEOC Charge, he has failed to exhaust his administrative remedies for that claim.  *See* Def.'s Mot. at 5–8.  "The exhaustion of administrative remedies requirement is less stringent for hostile work environment claims than for discrete claims of discrimination or retaliation."  *Na'im v. Rice*, 577 F. Supp. 2d 361, 372 (D.D.C 2008) (citations omitted).  A plaintiff may adequately exhaust administrative remedies without specifically alleging a hostile work environment claim in his formal EEOC complaint so long as the hostile work environment claim is "like or reasonably related to the allegations . . . [in the formal EEO[C] complaint] and grows out of such allegations." *Roberson v. Snow*, 404 F. Supp. 2d 79, 96 (D.D.C. 2005) (citing *Jones v. Billington*, 12 F.Supp.2d 1, 7 (D.D.C. 1997)).

Plaintiff alleges in his EEOC Charge that WMATA declined to interview him for a position in 2019, that his supervisor "harassed" him, and that his supervisors created a "fraudulent" PIP. His hostile work environment claim in the Amended Complaint is supported by these same factual allegations, *see* Am. Compl. ¶ 105,  and so the Court shall not bar Plaintiff from proceeding with his hostile work environment claim due to his failure to explicitly identify "hostile work environment" as the nature of his claims in his EEOC submissions.  *See, e.g.*, *Dudley*, 924 F. Supp. 2d at 163.

The Court nonetheless concludes that summary judgment in WMATA's favor is appropriate as to Plaintiff's hostile work environment claim.  To prove a hostile work environment, a plaintiff must demonstrate that the "workplace is permeated with discriminatory intimidation, ridicule, and insult" and that this behavior is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted).  "In determining whether a hostile work environment claim exists, [courts] look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morgan*, 536 U.S. at 116 (quoting *Harris*, 510 U.S. at 23). This standard ensures that "Title VII does not become a general civility code," requiring the courts to "polic[e] the ordinary tribulations of the workplace." *Bonnett v. Skinseki*, 907 F. Supp. 2d 54, 80 (D.D.C. 2012) (internal citations and quotation marks omitted).

Plaintiff's hostile work environment claim rests on the same actions as his discrimination claim (the two denials of an interview for the TAMO Director position; the denial of the opportunity for him to present the EALM/EASI in April 2019; having his pay delayed after returning from EAP leave in October 2019, and being placed on a PIP in December 2019).[13] Am. Compl. ¶ 105.  As an initial matter, Plaintiff has failed to exhaust many of these discrete discriminatory acts, *see supra* Section III(A)(1); a "plaintiff cannot cure his failure to timely exhaust his complaints about these incidents by sweeping them under the rubric of a hostile work

---

[13] Although Plaintiff relies on multiple incidents in his Amended Complaint as the basis for his hostile work environment claim, his Opposition and Cross-Motion appears to limit this claim to incidents occurring in 2019 and later.  *See* Pl.'s Opp'n & Cross-Mot. at 15 ("The hostile work environment commenced in 2019[.]").  Nonetheless, the Court addresses *all* incidents addressed in the Amended Complaint.

environment claim." *Dudley*, 924 F. Supp. 2d at 164 (internal citations and quotation marks omitted). A plaintiff must demonstrate that the time-barred incidents are "adequately linked" with the exhausted incidents "into a coherent hostile work environment claim." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011). To do so, the plaintiff must demonstrate that all events "involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Dudley*, 924 F. Supp. 2d at 164 (quoting *Morgan*, 536 U.S. at 120–21). Here, Plaintiff relies on a number of "discrete acts" without demonstrating that they are "part of the same unlawful employment practice." *Morgan*, 536 U.S. at 117. Rather, the evidence on the record demonstrates that these discrete actions spanned at least two years and involved decisions made by different supervisors. Plaintiff has not demonstrated any "link" connecting these various actions as part of "the same unlawful employment practice."

Moreover, courts have "generally rejected" such "work related actions by supervisors" as the basis of hostile work environment claims. *Grosdidier v. Chairman, Broadcasting Bd. of Governors*, 774 F. Supp. 2d 76, 110-11 (D.D.C. 2011); *see Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context."); *Houston v. SecTek, Inc*., 680 F. Supp. 2d 215, 225 (D.D.C. 2010) ("Allegations of undesirable job assignment or modified job functions and of [supervisor's] unprofessional and offensive treatment are not sufficient to establish that [plaintiff's] work environment was permeated with discriminatory intimidation, ridicule, and insult.") (internal citations and quotation marks omitted), *aff'd*, 407 F. App'x. 490, 2011 WL 318401 (D.C. Cir. Jan. 31, 2011). The challenged actions here are the type of "work-

related actions by supervisors" that provide insufficient grounds for a hostile work environment claim. *Grosdidier*, 774 F. Supp. 2d at 111.

Plaintiff has also failed to present evidence to connect any of the actions underlying his hostile work environment claim to his race. "Courts in this jurisdiction have routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Grosdidier*, 774 F. Supp. 2d at 108–09 (quoting *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009)). Plaintiff has produced *no* evidence connecting any alleged adverse actions to his race. During his deposition, he could not point to *any* examples of race-related comments or slurs directed towards him. *See* Ferguson Dep. 45:17–20; 62:22–63:12; 214:14–216:21.

At most, Plaintiff references an incident in which Mr. Collins yelled at a female African-America co-worker in August 2019. *See* Pl.'s Reply at 9; Ferguson Dep. 228:17–21. There is no evidence on the record that this incident involved any racially discriminatory comments or motivation. *See* Ferguson Dep. 228:17–21 (indicating only that Mr. Collins "yell[ed] and scream[ed] at a Black woman in the officer"); Pl.'s Ex. 8, at 23 (Ferguson Witness Stmt.) (same). Even assuming *arguendo* that this incident was an "incident of workplace racism," the Court must "be careful when weighing" evidence of incidents not directly involving Plaintiff. *Dudley*, 924 F. Supp. at 166–67; *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) ("When racial statements are not made directly to a plaintiff, generally a hostile environment cannot be established."); *Lester v. Natsios*, 290 F. Supp. 2d 11, 31 (D.D.C. 2003) ("conduct directed at others rather than at plaintiff . . . is less indicative of a hostile work environment"). Here, the Court finds that this discrete incident does not overcome the absence of *any* evidence pertaining to pervasive

hostility based on race directed towards Plaintiff. Plaintiff has not proffered any evidence establishing that the predicate acts upon which his hostile work environment claim rest were severe or pervasive enough to suggest that Plaintiff suffered an abusive working environment "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21. Nor has he pointed to any evidence (beyond his mere speculation) permitting a reasonable juror to conclude that any of the actions upon which his claim relies were motivated by or connected to his race.

Finally, to the extent Plaintiff seeks to pursue an implied "constructive discharge" claim, that claim also fails. *See, e.g.*, Am. Compl. ¶ 105 (claiming that Plaintiff sought another job due to the alleged hostile work environment). A constructive discharge claim requires Plaintiff to show (1) he was subjected to severe and pervasive harassment that altered the conditions of his employment (a hostile working environment), and (2) the work environment was "so intolerable that a reasonable person would have felt compelled to resign." *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004); *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008). For the same reasons Plaintiff's hostile work environment claim fails, so too does his constructive discharge claim.

Accordingly, the Court **GRANTS** WMATA's Motion for Summary Judgment as to Count II of the Amended Complaint (hostile work environment) and **DENIES** Plaintiff's Cross-Motion for Summary Judgment as to the same.

### C. Retaliation Claim (Count III)

Finally, WMATA contends that Plaintiff failed to exhaust his administrative remedies as to his retaliation claim by failing to identify "retaliation in his EEOC submissions. Def.'s Mot. at 7. As with discrete incidents of discrimination, "[d]iscrete claims of retaliation must be separately charged and exhausted within the appropriate limitations period." *Dudley*, 924 F. Supp. 2d at 181 (citing *Morgan*, 536 U.S. at 113). Notably, Plaintiff did *not* check the available box for "Retaliation" as a basis for his EEOC Charge and nowhere does his EEOC Charge or EEOC Letter

provide facts about any protected activity or basis for WMATA's purported "retaliation."  *See* .
Although Plaintiff's ability to proceed with his Title VII claim does not hinge on his invocation of
"magic words," *Dudley*, 924 F. Supp. 2d at 175, he must at the very least establish *some* connection
between any exhausted claims and the retaliatory acts.

Although not entirely clear from Plaintiff's pleadings, he seems to argue that WMATA
took two retaliatory actions: first, it withheld his pay when he returned from EAP leave in
retaliation for him taking leave; and second, it assigned him to a PIP after he applied for the TAMO
director position.[14]  Pl.'s Opp'n & Cross-Mot. at 22.  Before addressing the WMATA's exhaustion
argument, the Court concludes that neither of these claims can proceed as a legal matter.  To prove
retaliation under Title VII, a plaintiff must show that he (1) engaged in *statutorily protected
activity*; (2) suffered a materially adverse action by her employer; and (3) "a causal link connects
the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (emphasis added).  "Protected
activity under Title VII includes having 'made a charge, testified, asserted, or participated in any
manner in an investigation, proceeding, or hearing' on the basis of discrimination" under, in this
instance, Title VII.  *Arias v. Marriott Int'l.*, 217 F. Supp. 3d 189, 195–96 (D.D.C. 2016) (quoting
*Jones v. Billington*, 12 F. Supp. 2d 1, 13 (D.D.C. 1997)).  Plaintiff has cited *no* legal authority for
the proposition that taking leave or applying for a promotion is a "protected activity" under Title
VII.  *See* Pl.'s Opp'n & Cross-Mot. at 16.

Moreover, WMATA is correct that Plaintiff has failed to exhaust his administrative
remedies to the extent his retaliation claim hinges on "seeking EAP leave"; his EEOC submissions

---

[14] Plaintiff appears to abandon this second basis for retaliation in his Reply, indicating that
"withholding the Plaintiff's pay for making use of EAP, is *the* retaliation from which Plaintiff
seeks relief," without making any reference to his theory that the PIP was "retaliation" for applying
for a promotion.  Pl.'s Reply at 9. Nonetheless, the Court addresses both arguments out of an
abundance of caution.

are entirely devoid of facts related to that event.  *See* Pl.'s Opp'n & Cross-Mot. at 22 (arguing that "Plaintiff engaged in protected activity seeking EAP leave.").  There are *no* facts relating to Plaintiff's EEOC complaint to his EAP, his leave, or the issues with his pay in October 2019 contained in his EEOC Charge.[15]  Accordingly, his failure to exhaust his administrative remedies insofar as his retaliation claim relies on his delayed receipt of pay when he returned from EAP leave supplies an additional basis for granting summary judgment in WMATA's favor.

The Court **GRANTS** WMATA's Motion for Summary Judgment as to Count III of the Amended Complaint (retaliation) and **DENIES** Plaintiff's Cross-Motion for Summary Judgment as to the same.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** WMATA's Motion for Summary Judgment and **DENIES** Plaintiff's Cross-Motion for Summary Judgment.  This case shall be dismissed with prejudice.  An appropriate order accompanies this Memorandum Opinion.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge

**Date:** September 21, 2022

---

[15] As noted, *supra* Section III(A)(1), his delayed pay in October 2019 also falls outside the 180-day limitations period preceding his letter to the EEOC.